Mathews (Mike) Rubino v. Commissioner.
Rubino v. Commissioner
Docket No. 42323.
United States Tax Court
T.C. Memo 1954-3; 1954 Tax Ct. Memo LEXIS 245; 13 T.C.M. (CCH) 353; T.C.M. (RIA) 54109; April 8, 1954, Filed Joseph W. Louisell, Esq., and John F. Noonan, Esq., for the petitioner. Peter K. Nevitt, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioner and additions to tax for fraud and failure to file returns under sections 293(b) and 291(a) of the Internal Revenue Code, respectively, as follows, for the indicated years: Additions to tax
Income
Sec.
Sec.
Year
Tax
293(b)
291(a)
1944
$ 928.30
$ 843.15
$232.07
1945
3,653.14
2,954.77
913.29
1946
16,943.38
8,471.69
The issues presented are the correctness of the respondent's action in determining that (1) the petitioner *246 had taxable income for the years 1944 and 1945, (2) the income reported by the petitioner for the year 1946 was understated, (3) the petitioner was liable for additions to tax for fraud for the years 1944, 1945 and 1946 under section 293(b) of the Internal Revenue Code, and (4) the petitioner was liable for additions to tax for failure to file returns for 1944 and 1945 under section 291(a) of the Internal Revenue Code. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner resided in Detroit, Michigan, during 1944 and a part of 1945. In 1945 he moved to Grosse Pointe, Michigan, where he resided during the remainder of 1945 and throughout 1946. Petitioner did not file an income tax return for 1944 or 1945, but did file a return for 1946 with the collector for the district of Michigan at Detroit. Petitioner did not file an income tax return for any year prior to 1943. The petitioner was born and reared in Detroit. His education consisted of completing five grades of school. In 1934, at the age of 23, he was convicted of counterfeiting and sentenced to prison. He was in prison for 62 months *247 and was released in 1939. In 1941 he was convicted of a narcotics conspiracy and returned to prison for 14 months. Petitioner did not work from the time of his release from prison in 1939 to the time of his second conviction in 1941. After he was released from prison in 1942, he obtained his living by gambling on horse races, football games, hockey games and other sporting events. His total income during the remainder of 1942 was $215 as shown by monthly supervision reports submitted to the Supervisor of Parole, Bureau of Prisons, Department of Justice. Petitioner filed an income tax return for 1943 reporting income of $2,280. In this return he listed his mother as a dependent and there stated that she was "Incapable of self support due to illness and old age." He kept no books or records of his gambling or business transactions during 1944, 1945 and 1946. On November 15, 1943, Leo Sullivan, an acquaintance of the petitioner, submitted to the owners of a building in Detroit, known as the Navahoe Building, an offer to purchase it for $47,000. Thereafter the offer was accepted and on January 20, 1944, Grace Rubino (mother of petitioner), Rose Lucido and Alvera Massu, as purchasers, *248 entered into a land contract with the owners for the purchase of the property. Rose Lucido is the wife of Sam Lucido and Alvera Massu is the wife of George Massu, a friend of the petitioner. Although Sullivan arranged for the purchase of the property by the foregoing parties, he had no discussion with Grace Rubino about the matter. The down payment on the purchase, $11,750, was handed to Sullivan by George Massu. In 1951 a deed to the property was executed to the named purchasers. However, neither the land contract nor the deed had been made a matter of public record at the time of the hearing. Grace Rubino's alleged interest in the Navahoe Building on December 31, 1944, 1945 and 1946 was as follows: Dec. 31, 1944
Dec. 31, 1945
Dec. 31, 1946
Pro rata portion of purchase price
$15,666.67
$15,666.67
$15,666.67
Pro rata portion of amount owed on property
11,048.25
5,899.86
4,814.33
Amount paid during year
4,618.42
5,148.39
1,085.53
The Commissioner determined that the interest in the Navahoe Building purported to have been purchased by Grace Rubino either was paid for by Grace Rubino out of funds given to her by petitioner or was actually owned *249 by petitioner. Grace Rubino died May 12, 1949. Petitioner's father, Dominic Rubino, died in Wayne County, Michigan, in 1926 and the records of the Wayne County Probate Court do not show that he left any estate. The father did not file an income tax return for the years 1914 to 1926, inclusive. On May 6, 1925, Dominic and Grace Rubino mortgaged their home for $1,800. Grace Rubino was in arrears in the interest payments on the mortgage from 1933 to 1936 and made no payments on principal from 1935 to 1937. The mortgage was paid and retired on August 17, 1942. Prior to 1944 Grace Rubino filed no income tax returns. Income tax returns were filed by or for her for 1944, 1945 and 1946. Grace Rubino's daughter, who is also named Grace Rubino, was named administratrix of her mother's estate. In the petitioner for administration filed by the administratrix, the only asset listed was an unidentified parcel of real estate valued at $15,000. No claims were filed against the estate. On December 27, 1949, the administratrix was ordered by the Probate Court to close the estate within one year. The estate was not closed as ordered nor had it been closed at the time of the hearing in this proceeding. *250 No accounting of the estate assets has ever been made. The petitioner had $7,500 in cash on hand December 31, 1945, and in January 1946 gave his wife $5,000 in cash. On March 1, 1946, the petitioner entered into the following partnership agreement with Irwin B. Moss and Sam Lucido: "ARTICLES OF AGREEMENT made the 1st day of March, A.D. 1946 between IRWIN B. MOSS, SAM LU CIDO AND MIKE RUBINO. "WITNESSETH AS FOLLOWS: "1. The said parties above named have agreed to become co-partners in business, and by these presents do agree to become co-partners together under the firm and partnership name of MOSS MUSIC COMPANY in the business of buying, selling, leasing, renting, letting automatic music boxes and vending machines in the City of Detroit, Wayne County, Michigan and elsewhere as business requires, the said partnership to commence on the 1st day of March, A.D. 1946 and to continue for thirty (30) years thereafter. "2. To that end and purpose the said Irwin B. Moss, Sam LuCido and Mike Rubino have contributed capital in the total amount of ten thousand dollars ($10,000.00) in equal shares, the capital stock so formed to be used and employed in common between them, for the support *251 and management of the said business, to their mutual benefit and advantage. "3. IT IS AGREED by and between the parties hereto that at all times during the continuance of their co-partnership, they and each of them shall and will give their personal attention to the said business, and will to the utmost of their skill and power exert themselves for their joint interest, profit, benefit and advantage, in the said business. "4. IT IS ALSO AGREED by and between the parties hereto that they shall and will at all times during the said co-partnership, bear, pay and discharge equally between them, all rents and other expenses that may be required for the support and management of the said business; and that all gains, profits and increase that shall grow or arise from or by means of the said business, shall be divided between them as follows: Share and share alike. "5. IT IS ALSO AGREED by and between the parties hereto, that there shall be had and kept at all times during the continuance of their said co-partnership, perfect, just and true books of account, wherein each of the said partners shall enter and set down all moneys by them or either of them received, paid, laid out and expended *252 in and about their said business, and also all goods, wares, commodities, and merchandise by them or either of them bought or sold, by reason or on account of their said business, and all other matters and things whatsoever to their said business and the management thereof in anywise belonging; which said books shall be used in common between the said partners, so that either of them may have access thereto, without any interruption or hinderance from the other. "6. And also, that the said partners once in sixty days or oftener, if necessary, shall make, yield and render, each to the other, a true, just and perfect inventory and account of all profits and increase by them or either of them made, and of all losses by them or either of them sustained, and, also, of all receipts, payments, disbursements, and of all other things by them made, received, disbursed or done in their said co-partnership business, and such inventory and account being so made, that said parties shall and will adjust, pay and deliver, each to the other, at the time, their just share of the profits, and pay and bear their just share of the expenses and losses so made as aforesaid. "7. IT IS ALSO AGREED by and *253 between the parties hereto, that during the continuance of the said co-partnership neither of them shall nor will indorse any note, or otherwise become surety for any person or persons whomsoever, without the consent of the other of the said partners. "8. IT IS ALSO AGREED by and between the parties hereto, that at the end of their said co-partnership, the said co-partners, each to the other, shall and will make a true, just and final account of all things relating to their said business, and in all things truly adjust the same; and all stock, as well as the gains and increase thereof, which shall appear to be remaining, either in money, debts owing to said co-partnership, goods, wares, fixtures, or otherwise, shall be divided between them. "9. IT IS ALSO AGREED by and between the parties hereto that the net income realized from the operation of the business as herein provided for after payment of all business expenses shall be payable equally to each of the several partners hereto. "10. IT IS ALSO AGREED by and between the parties hereto that two (2) of the partners hereof, to-wit: IRWIN B. MOSS AND SAM LU CIDO, may withdraw from the bank funds of the said co-partnership, but *254 that the signatures of the two (2) here named shall be required to withdraw any funds from the bank account of the said co-partnership. "IT IS ALSO AGREED by the parties hereto, that in case of the violation of any of the foregoing convenants and obligations by either of the parties hereto, the party not in default may, at his option, dissolve the said partnership, by giving the party in default thirty (30) days previous notice in writing of his election so to do." * * *
Journal entries were recorded on the books of Moss Music Company as follows: "2/27/46 "To record contract with Bilvin Dist. Co. to purchase 50 new Wurlitzer record players. Deposit required 50.00 each. Paid Cash 1250.00 note for 1250.00 balance payable 5/1/46 deposited 2/27/46. "3/1/46 "To record formation of partnership of equal shares between Irwin Moss, Sam Lucido and Mike Rubino with the understanding that it is to be sub-rose until the business shows a profit. "Capital invested by Sam Lucido and Mike Rubino 10,000.00 "5/18/46 "To record addition of capital by Sam Lucido and Mike Rubino of $7,660.00 "7/6/46 "To record additional capital of Sam Lucido and Mike Rubino of 10,695.00. "Deposited *255 July 6, 1946. "5/2/47 "To record dissolution of partnership of Sam Lucido and Mike Rubino bought out Irwin Moss of 29,000 25,000 Cash and promise to pay 4000.00 balance." The ledger sheets of a checking account in the name of Moss Music Company at the Industrial National Bank, Detroit, Michigan, showed the following: Deposit
2-27-46
$ 1,250
Deposit
5-18-46
7,660
Deposit
7- 6-46
10,695
Withdrawal
5- 2-47
25,000
Lucido decided to end the Moss Music Company in April 1947. He called Irwin Moss and told him he wanted his money. A loan was negotiated from Coin Machine Acceptance Corporation of Chicago by Bilvin Distributing Company. Moss deposited a check for $43,000 in the Industrial National Bank. Moss offered Lucido a check for $25,000 but Lucido demanded cash. Moss cashed a check for $25,000 and put the money in a drawer of his desk. Moss then called Lucido and Lucido said either he or someone would come over for the money. Moss left the office and when he returned the money was gone. No further demands were made for the investment in the business. Respondent determined petitioner's interest in Moss Music Company on December 31, 1946, to consist *256 of one half of the following deposits and original contribution: Original contribution
$10,000.00
Deposit 2-27-46
1,250.00
Deposit 5-18-46
7,660.00
Deposit 7- 6-46
10,695.00
Total
$29,605.00
Petitioner's one-half
$14,802.50
Early in 1946 petitioner invested in the Chester Music Company, a business venture in which Irwin Chester, Sam Lucido and petitioner were the interested parties. The venture engaged in buying, renting and servicing music boxes. Lucido and petitioner owned a 75 per cent interest and Chester owned the remaining 25 per cent interest. At the time the venture was formed, Lucido and petitioner contributed $10,000. Later another music box route was purchased and $25,000 in cash was invested by Lucido and petitioner, in equal amounts. An additional amount of $4,700 was furnished in equal amounts by Lucido and petitioner to pay a bill owed to Bilvin Distributors. The amounts contributed by Lucido and petitioner totaled approximately $38,000. The Chester Music Company was terminated in 1947 and at that time approximately $35,000 was returned to Lucido. Respondent determined petitioner's investment in Chester Music Company on December 31, 1946, to *257 be $19,830.50. During 1946 petitioner purchased for cash a 1946 Buick sedan at a price of $1,723.89 and a 1946 Chrysler sedan at a price of $2,056.10. He owned both of these cars on December 31, 1946. The value of assets owned by petitioner during the years 1944, 1945 and 1946, together with disbursements which petitioner made, are as follows: December 31,
December 31,
December 31,
1944
1945
1946
Assets
Cash on hand
$ 7,500.00
Moss Music Co. investment
$14,802.50
Chester Music Co. investment
19,830.50
1946 Buick Sedan
1,723.89
1946 Chrysler Sedan
2,056.10
Total assets
$ 7,500.00
$38,412.99
Less Asset of Previous Year
7,500.00
$ 7,500.00
$30,912.99
Add Disbursements
Living expenses
$3,000.00
$ 3,000.00
$ 3,000.00
Income tax paid
734.00
2,256.40
1,776.60
Gifts to Marie Rubino
5,000.00
Funds advanced to Navahoe Bldg.
4,618.42
5,148.39
1,085.53
Total Disbursements and Assets; also Total Income
$8,352.42
$17,904.79
$41,775.12
Less Income Reported
9,370.69
Understatement of Income
$8,352.42
$17,904.79
$32,404.43
The petitioner filed declarations of estimated tax for 1944 and *258 1945 and relative thereto paid $734 and $2,256.40, respectively. All or some part of the deficiency in income tax for each of the years 1944, 1945 and 1946 is due to fraud with intent to evade tax. The petitioner's failure to file income tax returns for 1944 and 1945 was not due to reasonable cause but was due to wilful neglect. Opinion Respondent determined deficiencies in petitioner's income tax, together with additions to tax under section 293(b) of the Internal Revenue Code for the years 1944, 1945 and 1946 and additions to tax under section 291(a) of the Code for 1944 and 1945. In view of the fact that petitioner maintained no books and records, the respondent determined the deficiencies based on petitioner's increase in net worth for these years. The petitioner disputes the deficiencies in income taxes and penalties, relying upon the following contentions: (1) That he did not own an interest of any nature in the Navahoe Building between January 1, 1944 and December 31, 1946; (2) that he did not have any of his own funds invested in the Moss Music Company or the Chester Music Company as of December 31, 1946; (3) that he did not have cash in the sum *259 of $5,031.19 in the bank as of December 31, 1946; (4) that the respondent has failed to sustain his burden of proof that the petitioner is liable for the fraud penalties imposed by section 293(b) of the Code for 1944, 1945 and 1946; and (5) that the petitioner is not liable for delinquency penalties for 1944 and 1945 under section 291(a) of the Code. We shall consider each of the foregoing contentions in their respective order. Petitioner recognizes the fact that where in his pleadings he "avers the alleged deficiency is erroneous the burden of proof in that regard rests upon him." The respondent has determined that petitioner was the equitable owner of an interest in the Navahoe Building or, in the alternative, that if his mother was the actual owner of an interest in the building, then the amounts paid therefor were paid by petitioner and should be included among his disbursements. If petitioner is to prevail as to the alleged deficiencies, he must show that he was not the owner of an interest in the building and that he did not give his mother funds used to purchase an interest in it. In support of his position that he was not the owner of an interest in the building, the petitioner *260 contends that the land contract for the purchase of an interest in the Navahoe Building was signed by his mother; that upon completion of the payments provided for in the land contract, a deed was executed in which she was named as grantee; and that in her income tax returns for 1944, 1945 and 1946 a portion of the rents from the building was reported as her income. Although Grace Rubino signed the land contract in question and she is named as a grantee in the deed to the Navahoe property, the record is far from clear as to her part in the transaction. The offer to purchase was signed by one Leo A. Sullivan. Sullivan testified that he at no time discussed the purchase of the building with Grace Rubino and that George Massu gave him the money with which to make the down payment. Petitioner testified that his mother had sufficient funds with which to make the down payment on the Navahoe Building. The record does not substantiate his testimony. To the contrary, it is undisputed that at the time Sullivan was negotiating for the purchase of the building the petitioner was claiming his mother as a dependent on his income tax return. Petitioner contends that his mother derived the purchase *261 money from funds left her by his father, yet petitioner's father died in 1926 and there is no record of his having an estate. His parents' home was mortgaged for many years, and it is highly improbable that they would have found it necessary to mortgage their home had they possessed sufficient estate so that any substantial portion thereof descended to petitioner's mother at the death of his father. The fact that petitioner's mother filed an income tax return in 1944 in which she reported income from the building, and that respondent's deputy collector prepared income tax returns for her for 1945 and 1946 in which income from the building was reported is not in any sense conclusive of the issue. The facts and circumstances surrounding the acquisition of income are controlling of the issue, not its reported ownership. The petitioner has failed to show that the respondent's determination that he was the owner of the monies used by his mother for the purchase of the building is incorrect. This conclusion makes it unnecessary for us to discuss the respondent's primary position, that he was the owner of the equitable title to the Navahoe Building, as the result in either case is the *262 same with respect to his net worth. The second contention advanced by the petitioner is that he did not invest any of his own funds in Moss Music Company or Chester Music Company. The petitioner testified that he was a partner in both Moss Music Company and Chester Music Company. The record contains a partnership agreement signed by Sam Lucido, Irwin Moss and the Petitioner, wherein the parties recited that they had contributed $10,000 in equal shares in Moss Music Company. Entries contained in the general journal of the company also indicate that petitioner and Lucido contributed a total of $29,605 to the company. The bank statements of the Industrial National Bank where the partnership maintained an account support the journal entries. Further, the petitioner testified that he not only gave money to Lucido as a capital contribution for this company but also gave him money as a capital contribution to Chester Music Company, and that Lucido, himself, also made capital contributions to both companies. Simply because petitioner gave the money to Lucido and Lucido passed it to Moss and Chester does not establish that petitioner did not make the contributions. Lucido was merely a conduit. *263 The real substance of the transaction is that petitioner made capital contributions to both businesses. As our findings show, petitioner's interest in Moss Music Company was $14,802.50 on December 31, 1946. In connection with the Chester Music Company, petitioner stated he and Lucido had a 75 per cent interest and Chester had a 25 per cent interest therein, and that he and Lucido had agreed to a 50-50 split of the 75 per cent interest. Chester testified that approximately $38,000 was put into the business by Lucido and that when the venture was ended approximately $35,000 was returned by him to Lucido. We have found as a fact that petitioner's interest in Chester Music Company on December 31, 1946, was $19,830.50. Petitioner also contends that any investments he may have made came from borrowed funds and that respondent should accordingly reduce his net worth on December 31, 1946, by a liability for such borrowings in the amount of $25,000. In this connection petitioner testified that he borrowed $25,000 from an attorney named Doc Polozker, who had known petitioner for many years, and that when petitioner decided to go into the music box business Polozker gave him the money in *264 cash. Petitioner gave no note or security for the alleged loan nor did he at any time pay interest thereon. Petitioner testified that he received the $25,000 wrapped in a newspaper and that he did not open the package to count the money but simply turned it over to Lucido. Polozker is now dead and the portion of the testimony relating to Lucido was of course not corroborated by him. We are entirely unconvinced by petitioner's testimony and, accordingly, conclude that he did not in 1946 borrow the alleged sum of $25,000. The petitioner next contends that he did not have $5,031.19 cash in the bank as of December 31, 1946. Respondent does not now contend petitioner had any money in the bank on December 31, 1946. Consequently, in our findings we have included no amount of cash in petitioner's assets on that date. It has been stipulated by the parties that petitioner gave his wife $5,000 as a gift in 1946. The respondent has correctly included this amount in petitioner's expenditures. Further, petitioner contends respondent has failed to sustain his burden of proof that petitioner is liable for additions to tax because of fraud. The burden is on the respondent to establish fraud. Increases *265 in net worth convince us that petitioner had a substantial amount of income each year which he did not report. Obviously he knew that he had such income. All of his dealings have been in cash yet he has kept no record of his transactions. He has told us, on the one hand, that he had little or no investment in the Moss and Chester partnerships and, on the other hand, tells us that he borrowed money to finance his investments in those companies. His testimony in regard to the loan is totally unconvincing and obviously unreliable. He claims his mother was possessed of sufficient funds with which she was enabled to purchase an interest in a building. No convincing evidence is contained in this record, however, as to the source of such funds. Petitioner has obviously consistently attempted to conceal his business interests and transactions by the use of other persons' names in connection therewith. We conclude that all or some part of the deficiencies in tax are due to fraud with intent to evade tax. Lastly, petitioner contends he is not liable for the delinquency penalties for 1944 and 1945 under section 291(a) of the Code. The burden of proof is on the petitioner to show that the failure *266 to file the returns was due to reasonable cause and not due to wilful neglect. Charles C. Rice, 14 T.C. 503, 509. In explanation of his failure to file returns for 1944 and 1945, petitioner variously testified that for those years he filed returns which had been prepared by a bookkeeper; that when he filed such returns he did not know the difference between an income tax return and a declaration of estimated tax; and that when he filed declarations of estimated tax for 1944 and 1945 he thought he was filing his income tax returns for those years. The evidence shows that in March 1944 the petitioner filed an income tax return for 1943. In view of that fact, it is apparent that petitioner knew what an income tax return was, knew that it was for a period which had ended, and was aware of the necessity for filing returns for subsequent years. With such knowledge we think in filing his declarations of estimated tax for 1944 and 1945 he was cognizant of the fact that they were not income tax returns for those years but were estimates of what his tax liability would be for those years when such years had ended. Aside from the petitioner's uncorroborated statement that he filed *267 returns for 1944 and 1945, there is no evidence of such filing. Considering that statement in connection with the other of his statements which we have just considered, we have found that he filed no returns for those years and that his failure to do so was due to wilful neglect. Decision will be entered under Rule 50.